UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:04CV362 H

F I L E D
CHARLOTTE, N. C.

JUL 26 2004

U. S. DISTRICT COURT
W. DIST. OF N. C.

JAMES H. WILLIAMSON, J.H.
WILLIAMSON COMPANY, LLC.;
CHARLES LEE FERGUSON, JR., EL
PATRICIA FERGUSON, ROBERT
CHARLES FERGUSON, and JESSICA
DIXIE FERGUSON,

        Plaintiffs,

v.

CONSUMER DIRECT OF AMERICA, INC.,
MICHAEL A. BARRON, JOSEPH A.
COSIO-BARRON, and TERRY VICKERY,

        Defendants.

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiffs James H. Williamson and J.H. Williamson Company, LLC, ("JHW"), and Charles Lee Ferguson, Jr., El Patricia Ferguson, Robert Charles Ferguson, and Jessica Dixie Ferguson (collectively, the "Ferguson Family"), complaining of Defendants Consumer Direct of America, Inc. ("Consumer Direct"), Michael A. Barron, Joseph A. Cosio-Barron, and Terry Vickery, allege and say:

### JURISDICTION, VENUE, AND THE PARTIES

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

2.    The Court also has jurisdiction over the federal securities law claims herein pursuant to 28 U.S.C. § 1331, and original and supplemental jurisdiction over the state statutory and common law claims herein pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**PARTIES**

4. Plaintiffs James H. Williamson, Charles Lee Ferguson, Jr., El Patricia Ferguson, Robert Charles Ferguson, and Jessica Dixie Ferguson are citizens and residents of Mecklenburg County, North Carolina.

5. Plaintiff JHW is a North Carolina limited liability company whose member is a citizen and resident of Mecklenburg County, North Carolina.

6. Upon information and belief, Defendant Consumer Direct is a Nevada Corporation with its principal place of business in Las Vegas, Nevada and is the successor in interest of Consumer Capitol Holdings, Inc. ("CCH"). Upon information and belief, Consumer Direct is a publicly traded mortgage brokerage and ancillary services corporation (ticker sign CSUA: OTCBB).

7. According to its website, Consumer Direct employs over 350 people and had a closed loan volume of over $800 million and real estate sales of $50 million for the year ended December 31, 2003. On July 21, 2004 Consumer Direct announced that it has executed an agreement to acquire Ocean West Holding Corp., a Tustin, California-based publicly traded mortgage banking enterprise licensed as a mortgage bank in 38 states and writing approximately $1.1 billion in mortgages in 2003. The combined mortgage loan production of the two companies tops $150 million monthly.

8. At various times relevant to this litigation, Consumer Direct and CCH represented that they had offices in Charlotte, North Carolina and intentions to expand their presence there. For example, on or about August 1, 2001, CCH issued a Private Offering Memorandum to

2

prospective investors, including Charles Ferguson and Williamson, which stated that it has a satellite office in Charlotte, North Carolina. Further, in or about the beginning of 2002, Consumer Direct offered information on Bridge Financing Notes to investors, including Charles Ferguson and Williamson. Consumer Direct also represented there that it had a satellite center in Charlotte, North Carolina, offering "Mortgage Services, Credit Card Verification, and Homeservices."

9. Upon information and belief, Defendants Barron, Bailey, Grady, Cosio-Barron, Vickery, and Accardi are citizens and residents of Las Vegas, Nevada and are current or former officers and directors of Consumer Direct.

### SUMMARY OF ALLEGATIONS

10. Williamson, JHW and Charles Ferguson have been investors in Consumer Direct and its predecessor companies since 2000 and 2001. Their investments were procured through "road show" investment presentations, numerous calls, prospectuses and offering memorandum, and other representations and writings made in or to North Carolina. The combined amount of their investments in Consumer Direct and its predecessor companies is in excess of $1,000,000. On November 26, 2002 and March 27, 2003, respectively, Charles Ferguson and James Williamson were induced by Consumer Direct to enter into "Stock Purchase Agreements" dated November 12, 2002 and March 13, 2003 respectively (collectively, the "Agreements"). By the terms of the Agreements, Charles Ferguson and Williamson forgave certain valid and binding debts owed by Consumer Direct to them, arising from earlier investments, in exchange for prompt issuance and delivery of unrestricted and freely tradable shares of Consumer Direct stock. Consumer Direct breached those agreements when it delayed issuance and delivery of the stock for more than a year, and by issuing unregistered, restricted shares that were not freely

3

tradable. Consumer Direct further breached the agreements by failing to deliver at anytime approximately 177,450 shares of its stock. These investments, as well as others by Plaintiffs, were procured, converted, or delayed as a result of numerous false representations by Consumer Direct and its officers and directors, including, but not limited to, representations concerning (i) the nature of Plaintiffs' investments, (ii) Consumer Direct's failure to file and a registration statement with the Securities and Exchange Commission applicable to the Ferguson and Williamson investments, (iii) the financial and operational results and prospects for Consumer Direct, and (iv) the expected return on Plaintiffs' investments.

## BACKGROUND FACTS

11.     James Williamson, Charles Ferguson, and JHW made their initial investments in 2000 and 2001 in a company called 21st Century Financial Systems, Inc. ("21st Century"). Certain assets and liabilities of 21st Century were acquired in August 2001 by Consumer Capital Holdings, Inc. ("CCH").

12.     On February 20, 2002, Blue Star Coffee, Inc. acquired CCH through a stock exchange. Upon information and belief, prior to February 20, 2002, Blue Star Coffee was a publicly traded company with few assets. This acquisition transaction, known commonly as a "back door registration" or reverse merger, permitted CCH to acquire Blue Star's trading symbol and become a publicly traded enterprise.

13.     In early 2002, the merged entity changed its name to Consumer Direct of America, Inc. Consumer Direct now trades under the trade symbol CSUA, and its stock is traded on the OTC Bulletin Board, which is a regulated quotation service for over-the-counter equity securities. Defendant Consumer Direct is the successor in interest to CCH.

### Initial Investments

4

14. In approximately Fall or Winter of 2000, 21st Century came to Charlotte, North Carolina to solicit investors. Among those participating in these "roadshows" in Charlotte was Defendant Michael Accardi, who is currently an officer of Consumer Direct.

15. As a result of the roadshows and numerous representations and further solicitations directed at Williamson and Charles Ferguson in North Carolina, Charles Ferguson and Williamson made several equity investments in 21st Century. Charles Ferguson, for himself and family members, made equity investments of approximately $806,601 in 21st Century. Williamson, for himself and family members, made equity investments of approximately $98,000 in 21st Century.

16. On June 21, 2002, Plaintiffs received letters from Michael A. Barron of Consumer Direct of America purporting to distribute shares of Consumer Direct stock according to their pro-rata share of total capital invested in 21st Century.

17. In addition to these initial investments in 21st Century, Charles Ferguson and Williamson participated in certain debt investments in 21st Century, CCH, and Consumer Direct.

18. Consumer Direct gave Charles Ferguson and Williamson frequent assurances that their debt investments in CCH and Consumer Direct would be repaid in full and yield significant returns. For example, on September 6, 2002, Terry Vickery of Consumer Direct sent an email message to Charles Ferguson assuring him that Consumer Direct was "still working on different options to get you [$]150,000 back as soon as possible there is a couple of things in the works that could really get our stock rolling."

### Initial Ferguson Loans

19. On August 3, 2001, Charles Ferguson loaned $150,000 to CCH and received a promissory note on terms that guaranteed repayment of the principal plus $15,000 in interest and

5

a promise of further stock in 21st Century.

20.      In late 2001 or about the beginning of 2002, Consumer Direct offered information on "bridge financing notes" to potential investors, including Charles Ferguson and Williamson. In conjunction with this offer, Consumer Direct represented on numerous occasions that investors would receive a minimum guaranteed return of 110% on their investments and that the company would repay the notes out of the proceeds of a public offering.  Thus, the cover letter from Defendant Michael Barron (on behalf of Consumer Direct) that accompanied the bridge financing offering memorandum stated that "the filing of an SB-2 for up to $5 million is scheduled to follow upon closing" and that the SB-2 proceeds "will form the primary cash repayment asset to the bridge investors."

21.      On January 7, 2002, Charles Ferguson executed a Bridge Loan and Security Agreement, a Promissory Note, and a Common Stock Purchase Warrant with Consumer Direct in the principal amount of $170,000, signing these agreements in Charlotte, North Carolina.

22.      On January 22, 2002, Michael Barron wrote a letter to Charles Ferguson attempting to solicit additional investments in Consumer Direct and discussing plans for a Consumer Direct call center facility in Charlotte, North Carolina.  The letter encourages Charles Ferguson to carry over his existing loan by signing a new bridge finance agreement and states, "payback would come from our proposed SB-2 offering in the public company ($5 million in 2 months) plus you would receive warrants equivalent to $165,000 for an exercise price of $.01 per share.  Essentially, you double your money."

23.      On March 1, 2002, based on the representations of Consumer Direct, Charles Ferguson agreed to roll his bridge loan into another investment vehicle and executed a new Bridge Loan and Security Agreement with Consumer Direct in the principal amount of

6

$180,000, signing this agreement in Charlotte, North Carolina.

## Initial Williamson Loan

24.     On February 22, 2002, Williamson executed a Bridge Loan and Security Agreement, a Promissory Note, and a Common Stock Purchase Warrant with Consumer Direct in the principal amount of $25,000, signing these agreements in Charlotte, North Carolina. This loan was induced by promises, similar to those made to Charles Ferguson, that Williamson "would double his money."

## Ferguson Stock Purchase Agreement

25.     On November 26, 2002, Charles Ferguson was induced by Consumer Direct to enter into a "Stock Purchase Agreement" dated November 12, 2002. The Ferguson Stock Purchase Agreement is incorporated herein by reference and attached hereto as Exhibit A.

26.     The Ferguson Stock Purchase Agreement was entered into in exchange for forgiveness of certain valid and binding debts owed by Consumer Direct to Charles Ferguson, which arose from earlier investments.

27.     Under the terms of the Agreement, and by concurrent understanding of the parties, Consumer Direct was obligated to transfer 1,035,000 shares of unrestricted and freely tradable shares of capital stock to Charles Ferguson and the Ferguson Family, and to do so within two weeks of the effective dates listed on the Agreement, i.e., November 26, 2002. The Agreement provides in relevant part, "There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever."

28.     At various times between November 26, 2002 and December 8, 2003, Consumer Direct management repeatedly assured Charles Ferguson that the stock would come quickly and that it would be freely tradable and unrestricted.

7

29. At various times between November 26, 2002 and December 8, 2003, Consumer Direct also represented that it would effectuate a registration with the Securities and Exchange Commission of the shares to be transferred under the Ferguson Stock Purchase Agreement.

30. Among these representations were the following:

a. In a number of calls and voicemail messages, generally in response to Charles Ferguson's inquiries about the stock, Defendants Barron, Cosio-Barron, and Vickery repeatedly assured Charles Ferguson that his stock had been issued, or was in the process of being issued, and would arrive shortly.

b. On more than one occasion, during this period, Defendants Barron, Cosio-Barron, and Vickery informed Charles Ferguson that the shares had in fact been sent by mail or Federal Express and were "on the way" or words to that effect.

c. On other occasions, during this period and into December 2003, Defendants Barron, Cosio-Barron, and Vickery informed Charles Ferguson that a SB-2 filing or similar filings with the Securities and Exchange Commission were in process and would permit Charles Ferguson's shares to be traded freely.

d. As an example, on or about June 19, 2003 Charles Ferguson received a letter from Cosio-Barron of Consumer Direct, assuring Charles Ferguson that he was entitled to the issuance of stock under the Ferguson Stock Purchase Agreement and that this stock would be delivered upon the completion of Consumer Direct's filing of an SB-2 with the Securities and Exchange Commission which was expected to be accomplished "in the next few weeks." A true and correct copy of the undated letter which Charles Ferguson dated

"June 19, 2003" upon receipt is attached hereto as Exhibit B and incorporated herein by reference.

31.    These representations were all false, and Defendants had reason to know of their falsity when made.  Upon information and belief, Defendants knew of their falsity at the time the statements were made.

32.    For example, Consumer Direct filed an SB-2 registration statement with the Securities and Exchange Commission on or about August 20, 2003.  The registration statement does not purport to register the resale of any shares issued to, or held by any Plaintiffs, including Charles Ferguson.  The SB-2 registration statement was signed by Defendant Barron.

33.    In a letter signed by Defendant Barron, Consumer Direct applied to the Securities and Exchange Commission on or about May 12, 2004 to withdraw the SB-2 registration statement before it became effective.

34.    Charles Ferguson and the Ferguson Family received none of their shares under the Ferguson Stock Purchase Agreement until approximately December 8, 2003, in violation of the express terms of the Ferguson Stock Purchase Agreement and in contradiction of Consumer Direct's frequent assurances that the stock would be delivered quickly.

35.    As of the filing of this Complaint, Consumer Direct has failed to deliver approximately 175,000 shares of stock under the Ferguson Stock Purchase Agreement, in further violation of the express terms of the agreement and in contradiction of Consumer Direct's frequent assurances that the stock would be delivered quickly.

36.    In addition, the shares transferred in December of 2003 are restricted, thus greatly limiting the time, manner, and volume of any resale of the stock under applicable SEC rules and regulations.

9

37.     The price of Consumer Direct's shares fell from a high of $.75 per share during the week of November 10, 2003 to a current price of $.06 per share on an unadjusted basis. As the result of a 1 to 20 reverse stock split effectuated in early February 2004, the weekly trading volume of Consumer Direct's stock dropped precipitously, more than 500 fold in the weeks just after the reverse split.

## Additional Stock Issued to Ferguson

38.     On or before January 2003, Charles Ferguson agreed to accept additional unrestricted and freely tradable shares of capital stock of Consumer Direct under terms similar to the Ferguson Stock Purchase Agreement in exchange for forgiveness of additional valid and binding debts owed by Consumer Direct to Charles Ferguson.

39.     On or about January 23, 2003, Charles Ferguson received _restricted_ shares of stock, thus greatly limiting the time, manner, and volume of the resale of the stock under applicable SEC rules and regulations.

## Williamson Stock Purchase Agreement

40.     On March 27, 2003, Williamson was induced by Consumer Direct to enter into a "Stock Purchase Agreement" dated March 13, 2003. The Williamson Stock Purchase Agreement is incorporated herein by reference and attached hereto as Exhibit C.

41.     The Williamson Stock Purchase Agreement was entered into in exchange for forgiveness of certain valid and binding debts owed by Consumer Direct to Williamson, which arose from earlier investments.

42.     Under the terms of the Agreements, Consumer Direct was obligated to transfer unrestricted and freely tradable shares of capital stock to Williamson and to do so within two weeks of the effective dates listed on the Agreements, i.e., March 27, 2003. The Agreement

provides in relevant part, "There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever."

43.     At various times between March 27, 2003 and February 6, 2004, Consumer Direct management assured Williamson that the stock would come quickly and that it would be freely tradable and unrestricted.

44.     At various times between March 27, 2003 and February 6, 2004, Consumer Direct also represented that it would effectuate a registration with the Securities and Exchange Commission of the shares to be transferred under the Williamson Stock Purchase Agreement.

45.     Among these representations were the following:

a.     In a number of calls and voicemail messages, generally in response to Williamson's inquiries about the stock, Defendants Vickery and Cosio-Barron repeatedly assured Williamson that his stock had been issued, or was in the process of being issued, and would arrive shortly.

b.     On more than one occasion, during this period, Defendants Vickery and Cosio-Barron informed Williamson that the shares had in fact been sent by mail or Federal Express and were "on the way" or words to that effect.

c.     On other occasions, during this period and into February 2004, Defendants Vickery and Cosio-Barron informed Williamson that a SB-2 filing or similar filings with the Securities and Exchange Commission were in process and would permit Williamson's shares to be traded freely.

d.     As an example, in mid to late 2003, Williamson received a letter from Cosio-Barron of Consumer Direct, assuring Williamson that he was entitled to the issuance of stock under the Williamson Stock Purchase Agreement and that

11

this stock would be delivered upon the completion of Consumer Direct's filing of an SB-2 with the Securities and Exchange Commission which was expected to be accomplished "in the next few weeks." A true and correct copy of the undated letter sent to Williamson is attached hereto as Exhibit D and incorporated herein by reference.

46. On January 5, 2004, Williamson faxed Cosio-Barron's above-referenced letter back to him again requesting that his shares be delivered.

47. The representations made by Defendants were all false, and Defendants had reason to know of their falsity when made. Upon information and belief, Defendants knew of their falsity at the time the statements were made.

48. For example, Consumer Direct filed an SB-2 registration statement with the Securities and Exchange Commission on or about August 20, 2003. The registration statement does not purport to register the resale of any shares issued to, or held by any Plaintiffs, including Charles Ferguson. The SB-2 registration statement was signed by Defendant Barron.

49. In a letter signed by Defendant Barron, Consumer Direct applied to the Securities and Exchange Commission on or about May 12, 2004 to withdraw the SB-2 registration statement was later withdrawn on or about May 12, 2004 without becoming effective.

50. Williamson received none of their shares under the Williamson Stock Purchase Agreement until approximately February 6, 2004, in violation of the express terms of the Williamson Stock Purchase Agreement and in contradiction of Consumer Direct's frequent assurances that the stock would be delivered quickly.

51. In addition, the shares transferred on or about February 6, 2004 are restricted, thus greatly limiting the time, manner, and volume of any resale of the stock under applicable SEC

Case 3:04-cv-00362-GCM   Document 1   Filed 07/26/04   Page 12 of 29

rules and regulations.

52.     Finally, Williamson was not sent the total number of shares of stock to which he was entitled according to Consumer Direct's undated letter from Cosio-Barron, which states Williamson was entitled to receive 194,450 shares. Williamson was sent only 192,500 shares.

53.     The price of Consumer Direct's shares fell from a high of $.75 per share during the week of November 10, 2003 to a current price of $.06 per share on an unadjusted basis. As the result of a 1 to 20 reverse stock split effectuated in early February 2004, the weekly trading volume of Consumer Direct's stock dropped precipitously, more than 500 fold in the weeks just after the reverse split.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

54.     Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

55.     Consumer Direct agreed to abide by the terms of the Agreements.

56.     Consumer Direct has breached the Agreements and has failed and refused to abide by the terms of the Agreements. Plaintiffs have been injured by Consumer Direct's failure and refusal to abide by the terms of the Agreements.

57.     As a direct and proximate result of said breaches, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

**SECOND CAUSE OF ACTION**
**(Breach of Implied-In-Fact Contract)**

58.     Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

59.     Consumer Direct breached an implied-in-fact contract with Charles Ferguson with respect to the shares of Consumer Direct stock delivered to Charles Ferguson on or about January 23, 2003 under the common law of North Carolina because the course of dealings

13

between the parties supports the existence of a contract, whereby Charles Ferguson accepted additional unrestricted and freely tradable shares of capital stock of Consumer Direct under terms similar to the Ferguson Stock Purchase Agreement in exchange for forgiveness of additional valid and binding debts owed by Consumer Direct to Charles Ferguson.

60.   Charles Ferguson had no incentive to provide such forgiveness but for the expectation of compensation.

61.   As a direct and proximate result of said misrepresentations, Charles Ferguson has suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

### THIRD CAUSE OF ACTION
### (Fraud)

62.   Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

63.   Upon information and belief, Consumer Direct and its officers, agents and employees made fraudulent misrepresentations to Plaintiffs, more specifically alleged above, regarding:

    a.   the nature of Plaintiffs' investments;

    b.   Consumer Direct's failure to file a registration statement with the Securities and Exchange Commission applicable to the Ferguson and Williamson investments;

    c.   the financial and operational results and prospects for Consumer Direct; and

    d.   the expected return on Plaintiffs' investments.

64.   Consumer Direct and its officers, agents and employees made theses representations to Plaintiffs with the intention of deceiving them and inducing them to rely on those misrepresentations.

14

65. Plaintiffs were in fact deceived and reasonably relied upon these misrepresentations to their detriment.

66. As a direct and proximate result of said misrepresentations, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

## FOURTH CAUSE OF ACTION
### (Constructive Fraud)

67. Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

68. In encouraging Plaintiffs' investments and conversion of those investments, Consumer Direct and its officers and directors put themselves in a position which created a relationship of trust and confidence between themselves and Plaintiffs.

69. This position of trust allowed Consumer Direct to take advantage of Plaintiffs by inducing them to rely on representations by Consumer Direct, more specifically alleged above, regarding:

   a. the nature of Plaintiffs' investments;

   b. Consumer Direct's failure to file and a registration statement with the Securities and Exchange Commission applicable to the Ferguson and Williamson investments;

   c. the financial and operational results and prospects for Consumer Direct; and

   d. the expected return on Plaintiffs' investments.

70. Plaintiffs were in fact deceived and reasonably relied upon the misrepresentations of Consumer Direct and its officers, agents and employees to their detriment.

71. As a direct and proximate result of said misrepresentations, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

15

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

72.     Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

73.     Upon information and belief, Consumer Direct and its officers, agents and employees made negligent misrepresentations to Plaintiffs, more specifically alleged above, regarding:

> a.     the nature of Plaintiffs' investments;
>
> b.     Consumer Direct's failure to file and a registration statement with the Securities and Exchange Commission applicable to the Ferguson and Williamson investments;
>
> c.     the financial and operational results and prospects for Consumer Direct; and
>
> d.     the expected return on Plaintiffs' investments.

74.     These representations made by the defendants to Plaintiffs were false in that the defendants knew or should have known that these representations were false.

75.     Plaintiffs reasonably relied upon these misrepresentations to their detriment.

76.     As a direct and proximate result of said misrepresentations, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

## SIXTH CAUSE OF ACTION
### (Punitive Damages)

77.     Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

78.     The defendants' conduct, as described above, was characterized by willful and wanton conduct, and entitles Plaintiffs to recover punitive damages from the defendants in such amount as a jury shall determine at trial.

16

## SEVENTH CAUSE OF ACTION
### (15 U.S.C. §78j (b) and 15 U.S.C. §78t(a))

79.    Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

80.    As stated above, upon information and belief, Consumer Direct and its officers, directors, agents and employees used interstate commerce and the national securities exchange to (a) employ a device, scheme or artifice to defraud, (b) make untrue statements of material fact and omit material facts making the statements made misleading, and (c) engage in an act, practice, or course of business which operates as a fraud or deceit upon Plaintiffs in connection with the purchase of Consumer Direct securities.

81.    Defendants' schemes, statements and acts were made with fraudulent intent or at least out of reckless conduct.

82.    The individual Defendants had the power to control the actions of Consumer Direct and were culpable participants in the fraudulent activity.

83.    Plaintiffs' reasonably relied upon Defendants' schemes, statements and acts to their detriment.

84.    As a direct and proximate result of said schemes, statements and acts, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

## EIGHTH CAUSE OF ACTION
### (North Carolina Blue Sky Laws – N.C. Gen. Stat. § 78A-8)

85.    Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

86.    As stated above, upon information and belief, Consumer Direct and its officers, directors, agents and employees (a) employed a device, scheme or artifice to defraud, (b) made untrue statements of material fact and omitted material facts making the statements made

17

misleading, and (c) engaged in an act, practice, or course of business which operates as a fraud or deceit upon Plaintiffs in connection with the purchase of Consumer Direct securities.

87.     Defendants' schemes, statements and acts were made with fraudulent intent or at least out of reckless conduct.

88.     The individual Defendants had the power to control the actions of Consumer Direct and were culpable participants in the fraudulent activity.

89.     Plaintiffs' reasonably relied upon Defendants' schemes, statements and acts to their detriment.

90.     As a direct and proximate result of said schemes, statements and acts, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

## NINTH CAUSE OF ACTION
### (Nevada Blue Sky Laws – Nevada Rev. Stat. § 90.570)

91.     Plaintiffs reallege and incorporate paragraphs 1 through 53 herein by reference.

92.     As stated above, upon information and belief, Consumer Direct and its officers, agents and employees (a) employed a device, scheme or artifice to defraud, (b) made untrue statements of material fact and omitted material facts making the statements made misleading, and (c) engaged in an act, practice, or course of business which operates as a fraud or deceit upon Plaintiffs in connection with the purchase of Consumer Direct securities.

93.     Defendants' schemes, statements and acts were made with fraudulent intent or at least out of reckless conduct.

94.     The individual Defendants had the power to control the actions of Consumer Direct and were culpable participants in the fraudulent activity.

95.     Plaintiffs' reasonably relied upon Defendants' schemes, statements and acts to

their detriment.

96.     As a direct and proximate result of said schemes, statements and acts, Plaintiffs have suffered damages in an amount yet to be determined but believed to be in excess of $75,000.

WHEREFORE, Plaintiffs pray the Court that:

1.     Plaintiffs recover damages against Defendants in an amount yet to be determined but believed to be in excess of $75,000;

2.     The Agreements in this matter be rescinded and the value of the initial investments of Plaintiffs in this matter be returned to them with interest;

3.     Plaintiffs recover their attorneys' fees;

4.     Plaintiffs recover punitive damages;

5.     Plaintiffs recover pre-judgment and post-judgment interest at the maximum lawful rate;

6.     Plaintiffs have a trial by jury of all facts and issues so triable;

7.     The costs of this action be taxed to Defendants; and

8.     Plaintiffs have such other and further relief as the Court deems to be just and proper.

This __26th__ day of July, 2004.

John H. Cobb
N.C. Bar No. 17052

Brian A. Kahn
N.C. Bar No. 29291

HELMS MULLISS & WICKER, PLLC
201 North Tryon Street
Charlotte, NC 28202
Tel. 704/343-2000
Fax 704/343-2300

*Attorneys for Plaintiffs,*
*James H. Williamson, J.H. Williamson Company,*
*LLC, Charles Lee Ferguson, Jr., El Patricia*
*Ferguson, Robert Charles Ferguson, and Jessica*
*Dixie Ferguson*

# AGREEMENT STOCK PURCHASE

THIS AGREEMENT is made and entered into this 12th day of November,
2002, by and between Consumer Direct of America, a Nevada Corporation
(hereinafter referred to as "Seller") and *Charles L Ferguson Jr* (hereinafter
referred to as "Purchaser");

## W I T N E S S E T H :

WHEREAS, the Seller controls and is the record owner and holder of
the issued and certain outstanding freely trading shares of capital stock of
Consumer Direct of America, (hereinafter referred to as the "Corporation"), a
Nevada corporation, and

WHEREAS, the Purchaser desires to purchase said stock and the
Seller desires to sell said stock, upon the terms and subject to the conditions
hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and
agreements
contained in this Agreement, and in order to consummate the purchase and
the sale of the Corporation's Stock aforementioned, it is hereby agreed as
follows:

1.      PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the
closing of the transaction contemplated hereby, the Seller shall sell, convey,
transfer, and cause to be delivered to the Purchaser certificates representing
such stock, and the Purchaser shall purchase from the Seller the
Corporation's Stock in consideration of the purchase price set forth in this
Agreement. The certificates representing the Corporation's Stock shall be
duly endorsed for transfer or accompanied by appropriate stock transfer
powers duly executed in blank, in either case with signatures guaranteed in
the customary fashion, and shall have all the necessary documentary transfer
stamps affixed thereto at the expense of the Seller or at the request of the
Purchaser, Seller shall provide said shares to Purchaser direct from the stock
transfer agent bearing the Purchaser name on each and every stock
certificate.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held in Sellers place of business located in Las Vegas, Nevada. No later than _____ or such other place, date and time as the parties hereto may otherwise agree.

## 2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment shall be based on each company share valued at _.20¢_, The Purchaser shall pay to the Seller the sum of $207,000.°° dollars which shall represent _1,035,000_ shares which shall be payable to Seller in full in the form of a negotiable check or equivalent method of payment to include any credit due from any and all previous transaction with Seller or a combination of both methods of payment provided it is acceptable to the Seller.

## 3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a) Organization and Standing.

Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions on Stock.

There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

## 4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

## 5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Nevada.

(d). Notices.

Any and all notices, or any other communication provided for herein, shall be given in writing by registered or certified mail addressed, to the respective addresses appearing on this document, postage prepaid, by United States Mail.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, and executed on next page by all parties,



June, 19th 2003

# CONSUMER DIRECT OF AMERICA

6330 So. Sandhill Road #12
Las Vegas, NV 89120

Phone: 702-547-7358     Fax: 702-547-7358 (Computer FAX)

CHIP L FERGUSON
4800 SENTINEL POST RD
CHARLOTTE, NC 28226

Dear Mr. FERGUSON

Ref. Consumer Direct of America Stock Issuance

This will serve to confirm that the company recognizes that you are entitled to the issuance of Consumer Direct of America stock. We are in the process of addressing this situation and expect to issue you the respective shares that you are to receive as a shareholder upon completion of the registration statement form SB-2. We expect to have this matter accomplished in the next few weeks.

We would like to take this opportunity to thank you for your continued support and your vote of confidence in the company.

Should you have any questions please do not hesitate to contact me personally.

Sincerely,


Joseph A. Cosio-Barron

Cc: M. Barron, CEO
    File

THIS AGREEMENT is made and entered into this 13th day of March 2002, by and between Consumer Direct of America, a Nevada Corporation (hereinafter referred to as "Seller") and J.H. Williamson Company, LLC (hereinafter referred to as "Purchaser");

## W I T N E S S E T H:

WHEREAS, the Seller controls and is the record owner and holder of the issued and certain outstanding freely trading shares of capital stock of Consumer Direct of America, (hereinafter referred to as the "Corporation"), a Nevada corporation, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1.    PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and cause to be delivered to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer stamps affixed thereto at the expense of the Seller or at the request of the Purchaser, Seller shall provide said shares to Purchaser direct from the stock

transfer agent bearing the Purchaser name on each and every stock certificate.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held in Sellers place of business located in Las Vegas, Nevada. No later than March 27, 2003 or such other place, date and time as the parties hereto may otherwise agree.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment shall be based on each company share valued at 20 cents. The Purchaser shall pay to the Seller the sum of Thirty-eight Thousand Five Hundred ($38,500.) dollars which shall represent 192,500 shares which shall be payable to Seller in full in the form of a negotiable check or equivalent method of payment to include any credit due from any and all previous transaction with Seller or a combination of both methods of payment provided it is acceptable to the Seller.

3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a) Organization and Standing.

Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions on Stock.

There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Nevada.

(d). Notices.

Any and all notices, or any other communication provided for herein, shall be given in writing by registered or certified mail addressed, to the respective addresses appearing on this document, postage prepaid, by United States Mail.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, and executed on next page by all parties,

Seller:

Consumer Direct of America
20 Corporate Park, Suite 285
Irvine, California 92606

Michael Barron, CEO

_____ Date_____


Buyer:

J.H. Williamson Company, LLC
3108 Chamber Drive, Suite B
Monroe, NC  28110

_____ Date: March 13, 2003



# CONSUMER DIRECT OF AMERICA

6330 So. Sandhill Road #12
Las Vegas, NV 89120

Phone: 702-547-7358    Fax: 702-547-7358 (Computer FAX)

---

J. H. Williamson
3065 Senna Drive Suite B
Matthews, NC 28105
Fed ID # 56-1990461

Dear, Jim          (Registered Shares  194,445)

Ref. Consumer Direct of America Stock Issuance
This will serve to confirm that the company recognizes that you are entitled to the issuance of Consumer Direct of America stock. We are in the process of addressing this situation and expect to issue you the respective shares that you are to receive as a shareholder upon completion of the registration statement form SB-2. We expect to have this matter accomplished in the next few weeks.

We would like to take this opportunity to thank you for your continued support and your vote of confidence in the company.

Should you have any questions please do not hesitate to contact me personally.

Sincerely,


Joseph A. Cosio-Barron

Cc: M. Barron, CEO
     File