



| | | |
|---|---|---|
| JAMES H. WILLIAMSON, J.H. WILLIAMSON COMPANY, LLC, CHARLES LEE FERGUSON, JR., EL PATRICIA FERGUSON, ROBERT CHARLES FERGUSON, and JESSICA DIXIE FERGUSON,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER DIRECT OF AMERICA, INC., MICHAEL A. BARRON, JOSEPH A. COSIO-BARRON, and TERRY K. VICKERY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:04 CV 362-H<br><br>**DECLARATION OF MIKE BARRON SUBMITTED IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE STAY OR TRANSFER VENUE** |

## DECLARATION OF MIKE BARRON

I, Mike Barron, declare as follows:

1.  I am and at all relevant times herein have been, the Chief Executive Officer of Defendant Consumer Direct of America (hereinafter "CDA"). Consumer Capitol Holdings, Inc. (hereinafter "CCHI") is CDA's predecessor in interest. CCHI was a Nevada corporation.

2.  I have personal knowledge of the facts set forth in this Declaration and if called upon to do so, could and would competently testify thereto.

3.  This Declaration is submitted in support of Defendants' Motion to Dismiss or in the Alternative Stay or Transfer Venue.

4.  In or about November 2001, I was introduced to Charles Lee Ferguson He informed that he was interested in operating a branch of my mortgage brokerage company, Consumer Capitol Holdings, Inc. (Hereinafter "CCHI"). To that end, CCHI issued Mr. Ferguson

1



and his business partner, Fred Leggett, an exclusive license to operate a branch of CCHI in North Carolina. A true and correct copy of the Exclusive License Agreement is attached hereto as **Exhibit A**.

5.    In 2001, CCHI acquired certain assets held by 21st Century. After acquiring these assets CCHI loaned $200,000 to 21st Century. To secure that loan, CCHI held a UCC 1 lien over 21st Century's remaining assets. Mr. Ferguson was worried that CCHI would foreclose on 21st Century and requested that CCHI exchange stock with 21st Century's preferred stock holders, thus saving 21st Century's preferred stock holder's investments. This included Mr. Ferguson.

6.    In order to keep Mr. Ferguson happy and ensure that Mr. Ferguson and Mr. Leggett would operate the CCHI branch in North Carolina, CCHI issued the preferred stock to Mr. Ferguson. Additionally, CCHI agreed to honor a $150,000 note issued to him by 21st Century. A true and correct copy of the Asset Acquisition Agreement is attached hereto as **Exhibit B**.

7.    CDA is a Nevada corporation with its principal place of business in Las Vegas, Nevada. CCHI was a Nevada corporation with its principal place of business Las Vegas, Nevada.

8.    21st Century was a Nevada corporation with its principal place of business in Las Vegas, Nevada.

9.    Although CCHI issued Mr. Ferguson and Mr. Leggett an exclusive license to operate a branch of CCHI in North Carolina they never paid CCHI the $200,000 called for by the license agreement.

10.    A branch of CCHI/CDA never operated in North Carolina.

11.    Neither CCHI nor CDA purchased 21st Century. 21st Century is neither CCHI nor

2

CDA's predecessor in interest.

12.      Neither CCHI nor CDA traveled to North Carolina to solicit investments.

13.      I have never conducted business in North Carolina and have never solicited investments in North Carolina.

14.      I do not own property in North Carolina.

15.      The Asset Agreement was negotiated and executed on our end from Nevada. Following the execution of the Asset Agreement, CDA issued 175,000 shares of CDA stock to Mr. Ferguson, the UCC 1 liens were extinguished, and immediately after the execution of the Asset Agreement Mr. Ferguson converted his $150,000 note into a Bridge Loan.

16.      As interest accrued, Mr. Ferguson agreed to apply the principal and accrued interest on the Bridge Loan as payment for CDA stock, and accordingly, on or about November 12, 2002, Mr. Ferguson and CDA entered into an Agreement Stock Purchase. A true and correct copy of this Stock Purchase Agreement is attached hereto as **Exhibit C**.

17.      The terms of the Agreement Stock purchase were as follows:

     A.      Mr. Ferguson would apply the total Bridge Loan amount of $207,000 as consideration for the Agreement Stock Purchase.

     B.      Mr. Ferguson was to receive 1,035,000 unrestricted shares of pre-split CDA stock valued at 20 cents per share. Because 175,000 shares had previously been issued, CDA owed Mr. Ferguson 860,000 shares of stock.

18.      During the negotiations and issuance of the Stock Purchase Agreement, CDA, Mr. Cosio-Barron, and I were located in Nevada and Mr. Vickery was located in Colorado.

19.      Contemporaneous with the execution of the Agreement Stock Purchase, Mr.

3

Ferguson signed a General Release and Satisfaction of Payment releasing CDA from all liability for previous transactions. A true and correct copy of the General Release is attached hereto as **Exhibit D**.

20.     As consideration for the release, Mr. Ferguson received the reduced basis of 20 cents per share for the Agreement Stock Purchase.

21.     CDA's dealing with Mr. James H. Williamson (hereafter, "Mr. Williamson") began with the Stock Purchase Agreement.

22.     Mr. Ferguson convinced Mr. Williamson to participate in a stock purchase agreement. A true and correct copy of Mr. Williamson's Stock Purchase Agreement is attached hereto as **Exhibit E**.

23.     During the negotiation and issuance of the Stock Purchase Agreement, CDA, Mr. Cosio-Barron, and I were located in Nevada and Mr. Vickery was located in Colorado.

24.     On or about April 14, 2004, CDA filed a complaint against Plaintiffs in the United States District Court of Nevada seeking declaratory relief and for breach of contract. After Plaintiffs received service of that Complaint, they filed the instant retaliatory action.

25.     CDA is likely to call myself, Joe Cosio-Barron, Terry Vickery, Wayne Bailey, and Paul Grady to testify to any representations of fact that CDA may have made, assuming that any representations were in fact made, and to the amount of stock disbursed to Plaintiffs. We represent CDA's management and nerve center. Our absence from the State of Nevada could have disastrous consequences for CDA. Capitol investments could stagnate as well as loan production, which could eventually lead to layoffs.

26.     In addition to the aforementioned individuals, CDA expects to call Michael

4

Accardi, Dave Jones, William Dendiu, and Bruce Madrid to testify at trial. These witnesses represent the former principal agents of 21ˢᵗ Century and have first-hand knowledge of Defendants' investments in 21ˢᵗ Century and its "roadshows."

27. Michael Accardi, Dave Jones, and William Dendu all reside within the District of Nevada and Mr. Madrid resides in El Paso, Texas.

28. CDA has never made a profit. CDA has never declared a dividend. Every year CDA's expenses exceed it's revenue by 1,500,000.

29. In early 2004, Plaintiffs began accusing CDA of wrongfully withholding stock. CDA investigated the allegations and determined that they had no merit. On or about April 14, 2004, CDA filed a complaint against Plaintiffs in the United States District Court for the District of Nevada seeking declaratory relief and for breach of contract (exclusive license agreement). After Plaintiffs received service of that Complaint, they filed the instant, retaliatory action.

I declare under the penalty of perjury under the laws of the State of North Carolina that the foregoing is true and correct. Executed this 7ᵗʰ day of October, 2004 in Las Vegas, Nevada.

_____
Mike Barron, CEO

5



**CONSUMER CAPITAL HOLDINGS INC.**

*(A Financial Marketing Holding Company)*

## EXCLUSIVE LICENSE AGREEMENT

AGREEMENT made this 29th day of November , 2001, between Consumer Capital Holdings Inc. ("CCHI") and F & L Properties LLC. ("Licensee").

### WITNESSETH:

WHEREAS, Licensee would like to obtain an exclusive license from CCHI to market and operate the CCHI' Affiliate Call Center Program within the Licensed Location defined herein below, and a non-exclusive license from CCHI to market and sell CCHI' Financial Products to customers on a nationwide basis, and CCHI is willing to grant such licenses, all on the terms hereinafter set forth:

NOW, THEREFORE, CCHI and Licensee hereby agree as follows.

1.  **Definitions.**

    (a)  The term "Affiliate Call Center Program" means the "CCHI Affiliate Call Center Program ι, which is a program devised and trademarked by CCHI to allow regional Licensees to operate a CCHI technology based call center for the purposes of selling CCHI financial products.

    (b)  The term "Licensed Location" means the metropolitan area listed on Attachment 1 to this Agreement.

    (c)  Affiliate Program Services means the technical, administrative and operational services provided to each Licensed Location by CCHI. These services include:

    - HR support including access to CCHI benefits package
    - Financial administrative services
    - Access to CCHI's 401k/Investment program
    - Provision of sufficient inbound leads to loan officers
    - Access to CCHI ancillary financial products (insurance)
    - Periodic training seminars
    - Inclusion into CCHI technical web sites and marketing programs

2.  **Grant of License to Market Affiliate Program; Terms of Use; Period of License.**



EXHIBIT

A

(a)    CCHI hereby grants to Licensee, from the date of this Agreement until termination of the license as hereinafter provided, a non-transferable, non-assignable and non-sublicensable license to market the Affiliate Program solely within the Licensed Location.

(b)    While the license under this Agreement remains in effect, (i) CCHI will not license or permit anyone else to market the Affiliate Program in the Licensed Location, and (ii) CCHI will have the right to market the Affiliate Program to any other Licensed Location that has not yet agreed to participate in the Affiliate Program.

(c)    Licensee acknowledges the substantial value of any publicity, reputation and goodwill associated with the Affiliate Program, and that any goodwill associated with the Affiliate Program belongs to CCHI. Any additional goodwill that may develop because of this license will inure solely to the benefit of and belong solely to CCHI.

(d)    The license granted to Licensee under this Section 2 will remain in effect for so long as Licensee in the Licensed Location continues to participate in the Affiliate Program. In order for the Licensor to terminate the license, the Licensor must give written notice to Licensee of termination no less than 6 month's prior to the proposed termination date which notice must specifically articulate the factual basis of the Licensee's failure to participate. The Licensee shall have the right to cure such nonparticipation at any time during the 6 month period and in the event the Licensee has cured such nonparticipation, the license shall not terminate.

(e)    The license granted to Licensee under this Section 3 will remain in effect for a period of one year from the date of this Agreement and will continue thereafter unless and until either party gives the other thirty days' notice of termination.

3.    **Commissions and Payment of Commissions.**

(a)    **Initial Recovery of Capital,** CCHI will pay Licensee a commission of 50% of the net income fees received by CCHI for every mortgage loan or other CCHI sponsored financial product on which CCHI receives a commission that Licensee has originated via the Affiliate Program until such time that the cumulative total of all such fees is equal to 100% of the Initial License Fee set forth herein and paid in cash by the Licensee at the inception of this agreement.

(b)    **Continuing Operations Fee Sharing,** After to satisfaction of 4. (a) above, CCHI will pay Licensee a commission of 25% of the net income

2

fees received by CCHI for every mortgage loan or other CCHI sponsored financial product on which CCHI receives a commission that Licensee has originated via the Affiliate Program

(c)     On or before the 15th day of each month, CCHI will pay Licensee the commissions earned by Licensee during the preceding month. A commission is considered to be earned upon payment to CCHI or when CCHI receives a commission payment from a closed financial transaction under the Affiliate Program.

(d)     CCHI will maintain accurate records of all payments and commissions received under the Affiliate Program, as a result of Licensee's efforts under this Agreement. CCHI will make such records available to Licensee for examination and copying, on reasonable notice, during CCHI' normal business hours. CCHI will also furnish copies of such records to Licensee on a monthly basis.

4.     **Payment by Licensee to CCHI.**

Upon execution of this Agreement, Licensee shall pay to CCHI a one-time, non-refundable fee of Two Hundred Thousand Dollars ($200,000), which payment shall serve as consideration for the license rights granted hereunder and to pay CCHI for training, marketing materials and advertising provided by CCHI in connection with the Affiliate Program. Licensee shall have the option to apply the said fee toward the purchase of the common stock of CCHI and have CCHI issue 100,000 common shares to Licensee.

5.     **Warranties and Indemnity by CCHI.**

(a)     CCHI warrants to Licensee (i) that CCHI owns all of the rights in and to the Affiliate Program, (ii) that CCHI may grant to Licensee the rights granted under this Agreement and may do so without the approval or consent of anyone and the grant of such rights to Licensee does not violate any agreement binding upon CCHI, (iii) that the Affiliate Program does not violate or infringe on any patent, copyright, trademark, service mark or other right, and (iv) that no program misuses or misappropriates any trade secret or confidential information.

(b)     CCHI will indemnify Licensee against any liability and hold Licensee harmless from and pay any loss, damage, cost and expense (including, without limitation, legal fees) that Licensee incurs in connection with any breach of any of the warranties under Section 6(a) or any claim by a third party alleging facts that would constitute a breach of any of the warranties under Section 6(a); provided, however, that CCHI may, at its

3

Case 3:04-cv-00362-GCM   Document 14   Filed 10/08/04   Page 8 of 28

own expense, defend such claim; and if CCHI elects to do so, it will not be liable to Licensee for any cost or expense incurred by Licensee after CCHI notifies Licensee of its election.

(c)   Licensee will promptly notify CCHI of any claim against Licensee covered by CCHI' warranty under Section 6(a) with full details of the claim. Licensee will cooperate in the defense of any such claim and will not settle the same without CCHI' written consent unless Licensee releases CCHI from all of CCHI' obligations under this Section 6 with respect to the claim.

6.   **Licensee's Indemnity.**

(a)   Licensee will indemnify CCHI against any liability and hold CCHI harmless from and pay any loss, damage, cost and expense (including, without limitation, legal fees) that CCHI incurs arising out of Licensee's use of the license rights granted under this Agreement. This indemnity does not extend to claims that Licensee's use of the license rights as authorized under this Agreement violates the rights of another.

(b)   Licensee may, at its own expense, defend any claim against CCHI covered by this indemnity under subsection (a) above; and if Licensee elects to do so, it will not be liable to CCHI for any cost or expense incurred by CCHI after Licensee notifies CCHI of its election.

(c)   CCHI will promptly notify Licensee of any claim against CCHI covered by Licensee's indemnity under Section 7 with full details of the claim. CCHI will cooperate in the defense of any such claim and will not settle the same without Licensee's written consent unless CCHI releases Licensee from all of Licensee's obligations under this Section 7 with respect to the claim.

7.   **Nature of Relationship.**

This Agreement creates no relationship between CCHI and Licensee other than that of a licensor to a licensee. Licensee has no authority to commit CCHI in any manner or to incur any obligation on behalf of or in the name of CCHI.

8.   **Termination.**

On termination of the licenses under this Agreement, regardless of the reason or cause of termination, Licensee will immediately cease marketing the Affiliate Program.

4

Case 3:04-cv-00362-GCM   Document 14   Filed 10/08/04   Page 9 of 28

9.    **Notice.**

Notices and other communications under this Agreement shall be in writing and sent to each party at its address or fax number set forth above or, in the event of a change in any address or fax number, then to such other address or fax number as to which notice of the change is given.  Notices to CCHI will be sent to the attention of Michael Barron; notices to Licensee will be sent to the attention of F & L Property LLC.  Members. Notice will be deemed given on receipt.

10.   **Amendment; Waiver.**

This Agreement may be amended only by an instrument in writing signed by CCHI and Licensee.  No provision of this Agreement and no obligation of either party under this Agreement may be waived except by an instrument in writing signed by the party waiving the provision or obligation.

11.   **Governing Law.**

This Agreement will be governed by and construed in accordance with the laws of the State of California.

12.   **Section Headings.**

Section headings are for convenient reference only and shall not affect the meaning or have any bearing on the interpretation of any provision of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

CCHI

By: Michael J. Barron

Its: CEC

LICENSEE

By:

Its:

Janice K Rappleye
My commission expires
July 19, 2004
Notary for Union CoNCS

# CONSUMER CAPITAL HOLDINGS, INC.
## ACQUISITION AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into this _20_ day of August, 2001, by and between Consumer Capital Holdings, Inc., a Nevada corporation, (the "Buyer"), and 21ˢᵗ Century Financial Systems, Inc., a Nevada corporation (the "Seller").

## RECITALS

WHEREAS, the Seller owns certain equipment and other assets used for the proposed deployment of the 21ˢᵗ Century mortgage/real estate/insurance protocol and technology together with a telemarketing call-center doing business as IntelLink; and an option for the development of a Cyber-Center in cooperation with the City of Las Vegas.

WHEREAS, subject to the terms and conditions set forth herein, Seller desires to convey to Buyer, and Buyer desires to acquire from Seller certain tangible and intangible assets and properties used or held for use in the operation of the Mortgage Enhancement Business.

NOW THEREFORE, in consideration of the mutual agreements herein and in light of the recitals stated above, the parties hereto agree as follows:

*1. Purchase and Sale of Assets.*

On the terms of, and subject to the conditions set forth in this Agreement, Seller agrees to sell, convey, assign, transfer and deliver to the Buyer, at the closing (the "Closing") all of Seller's right, title and interest in the following (collectively, the "Assets"):

(a) Tangible Personal Property. All interests of Seller as of the date of this Agreement in the tangible personal property described on *Schedule 1.1(a)* attached hereto, and any additions and improvements thereto between the date of this Agreement and the Closing Date (collectively, "Tangible Personal Property").

(b)  Contracts. Those customer contracts listed and described on *Schedule 1.1(b)* attached hereto (the "Contracts").

(c)  Intangible Property. All interests of Seller as of the date of this Agreement in (i) the internet domain name: "_21FS.com_" including graphics and layout design for the www. _21fs.com_ web site, business cards and data sheet, (ii) the 21ˢᵗ Century trademarks and (iii) all business contracts and agreements set forth in *Schedule 1.1(b)*.

(d)  Customer List. The 21ˢᵗ Century, including all subsidiaries lists of customers, a copy of which is incorporated in *Schedule 1.1(c)*.

(e)  Goodwill. All of Seller's goodwill in, and going concern value of the Data Business.

8/7/2001_MDC

_21 ST_
_ACQUISITION AGREEMENT_

EXHIBIT
B

(a)     such assignment and assumption agreements other instruments as are
reasonably satisfactory to Seller to evidence Seller's assumption of
obligations under the Contracts;

8.      *Adjustments.* The operation of the Data Business the income and normal operating expenses
attributable thereto through September 15, 2001 (the "Adjustment Date") shall be for the account of
Seller and thereafter for the account of Buyer, and, if any income or expense is properly allocable or
credited, then it shall be allocated, charged or prorated accordingly. Expenses for employees, goods
or services received both before and after the Adjustment Date, power and utilities charges, and
rents and similar prepaid and deferred items shall be prorated between Seller and Buyer as of the
Adjustment Date in accordance with generally accepted accounting principles.    All special
assessments and similar charges or liens imposed against the Tangible Personal Property in respect
of any period of time through the Adjustment Date, whether payable in installments or otherwise,
shall be the responsibility of Seller, and amounts payable with respect to such special assessments,
charges or liens in respect of any period of time after the Adjustment Date shall be the responsibility
of Buyer, and such charges shall be adjusted as required hereunder. To the extent that any of the
foregoing prorations and adjustments cannot be determined as of the Closing Date, Buyer and Seller
shall conduct a final accounting and make any further payments, as required on a date mutually
agreed upon, within fifteen (15) days after the Closing.

9.      *Representations and Warranties of Seller.*

Seller hereby represents and warrants to Buyer that:

(a)     Seller is a corporation duly organized, validly existing and in good standing under
the laws of the state of Nevada. Seller has the requisite power and authority to own
and operate its assets, properties and business and to carry on its business as now
conducted.

(b)     The execution and delivery of this Agreement and the consummation of the
transactions contemplated hereby have been duly authorized and approved by the
officers and directors of the Seller.    When executed by the authorized
representatives of Seller, this Agreement will constitute a legal, valid and binding
agreement of Seller, except as such enforcement may be limited by bankruptcy,
insolvency or similar laws affecting creditors' rights generally or by the scope of
equitable remedies which may be available.

(c)     The execution and delivery of this Agreement and the consummation of the
transactions contemplated hereby will not result in a breach of the terms and
conditions of, or result in a loss of rights under, or result in the creation of any lien,
charge or encumbrance upon, any of the Assets for any reason, including but not
limited to (i) Seller's charter documents, (ii) any franchise, mortgage, deed of trust,
· lease, license, permit, agreement, instrument or undertaking to which Seller is a
party or by which it or any of its properties are bound, (iii) any statute, rule,
regulation, order, judgment, award or decree.

8/7/2001_MDC

5

(d)     The Assets are not subject to any material liability, absolute or contingent, which is not set forth in this Agreement, nor is the Seller subject to any liability, absolute or contingent that would effect the transfer of the Assets, which has not been disclosed to and acknowledged by the Buyer in writing prior to the Closing Date.

(e)     There is no suit, claim, action or proceeding now pending or to Seller's knowledge threatened before any court, administrative or regulatory agency or any basis for such a claim which may result in any judgment, order, decree, liability or other determination which could have a material adverse effect, financial or otherwise, upon any of the Assets. No such judgment, order or decree has been entered which has or could have such effect.

(f)     Seller has all licenses and permits (federal, state and local) necessary to conduct its business and such licenses and permits are in full force and effect. No violations are or have been recorded in respect of such licenses or permits and no proceeding is pending or threatened which could result in the revocation or limitation of any of such licenses or permits.

(g)     No other consent is necessary to effect the transfer to Buyer of any of the Assets and, upon the consummation of the transactions contemplated hereby, Buyer will be entitled to use the Assets to the full extent that Seller used the same immediately prior to the transfer of the Assets.

(h)     To Seller's knowledge, Seller on the Closing Date is in material compliance with all laws, orders and regulations of any governmental department, commission, board, agency or instrumentality, domestic or foreign, having jurisdiction over it or its operations, including but not limited to laws, orders, regulations and rules relating to occupational safety and health, environmental protection, consumer product safety, product liability, employee benefit plans and programs, collective bargaining and the payment of withholding and social security taxes. Seller has received no notice of, and is aware of no violations of, any of the foregoing laws, orders, regulations or rules.

(i)     Seller has not incurred any liability to any broker, finder or agent for any brokerage fees, finder's fees or commissions with respect to the transactions contemplated by this Agreement.

(J)     To the best of Seller's knowledge, neither this Agreement nor any exhibit to this agreement nor any written statement furnished to buyers this in connection with this Agreement contains an untrue statement of a material fact or omits to state a fact that is necessary in order to make the statements contained herein and therein, in light of the circumstances under which they are made, not materially misleading.

(k)     Except as expressly set forth in this section 9, seller makes no representation or warranty, express or implied, at law or in equity, in respect of any of its properties (including, without limitation, the assets), liabilities or operations, including, without limitation, with respect to merchantability or fitness for any particular purpose, and any

3/7/2001_MDC

4

such other representations or warranties are hereby expressly disclaimed. Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in this section 9, the buyer is purchasing the assets on an "as-is, where-is" basis. Without limiting the generality of the foregoing, the seller makes no representation or warranty regarding any properties other than the assets, and none shall be implied at law or in equity.

10.   *Representations and Warranties of Buyer.*

Buyer hereby represents and warrants to Seller that:

(a)   Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.

(b)   Buyer has taken all requisite corporate action to authorize and approve the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and this Agreement constitutes a legal, valid and binding agreement of Buyer, except as such enforcement may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by the scope of equitable remedies which may be available.

(c)   The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not violate the Articles of Incorporation or the Bylaws of Buyer or any agreement, contract or other instrument to which Buyer is a party, or any statute, rule, regulation, order, judgment, award or decree.

(d)   Neither this Agreement nor any exhibit to this Agreement nor any written statement furnished by Buyer in connection with this Agreement contains an untrue statement of a material fact or omits to state a fact that is necessary in order to make the statements contained herein and therein, in light of the circumstances under which they are made, not materially misleading.

11.   *Conditions Precedent to the Obligations of Buyer.*

All obligations of Buyer under this Agreement are, at its option, subject to fulfillment of each of the following conditions prior to or at the Closing:

(a)   All representations and warranties of Seller made in this Agreement or in any exhibit hereto delivered by Seller shall be true and correct as of the Closing Date with the same force and effect as if made on and as of that date.

(b)   Seller shall have performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by Seller prior to or at the Closing Date.

8/7/2001_MDC

5

12. *Conditions Precedent to the Obligations of Seller.*

All obligations of Seller under this Agreement are, at its option, subject to fulfillment of each of the following conditions prior to or at the Closing:

(a) All representations and warranties of Buyer made in this Agreement or in any exhibit hereto delivered by Buyer shall be true and correct on and as of the Closing Date with the same force and effect as if made on and as of that date.

(b) Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Buyer prior to or at the Closing Date.

13. *Further Assurances.*

Following the Closing, the parties hereto agree to take such actions and execute, acknowledge and deliver to each other such further instruments of assignment, assumptions, conveyance and transfer and take any other action as the other may reasonably request in order to more effectively convey, sell, transfer and assign to Buyer any of the Assets, to confirm the title of Buyer thereto, to assume the Assumed Liabilities and to reasonably assist Buyer in exercising its rights with respect to the Assets.

14. *Survival of Representations and Warranties.*

All representations and warranties made by each of the parties hereto shall survive the closing for a period of six months after the Closing Date.

15. *Indemnification.*

(a) Seller agrees to indemnify, defend and hold harmless Buyer against any and all claims, demands, losses, costs, expenses, obligations, liabilities and damages, including interest, penalties and reasonable attorneys' fees, incurred by Buyer arising, resulting from any breach of, or failure by Seller to perform, any of its representations, warranties, covenants or agreements in this Agreement or in any exhibit or other document furnished or to be furnished by Seller under this Agreement.

(b) Buyer agrees to indemnify, defend and hold harmless Seller against any and all claims, demands, losses, costs, expenses, obligations, liabilities and damages, including interest, penalties and reasonable attorneys' fees, incurred by Seller arising, resulting from or relating to any breach of, or failure by Buyer to perform, any of its representations, warranties, covenants or agreements in this Agreement or in any exhibit or other document furnished or to be furnished by Seller under this Agreement, or by reason of any act or omission of Buyer or any of its successors and assigns after the Closing Date that constitutes a breach or default under, or a failure to perform, any obligation, duty or liability of Seller which is expressly

assumed by the Buyer pursuant the Contracts, the GE-4 Sublease, the Facility Lease or pursuant to the terms hereof.

18. *Notice.*

Notice will deemed to be given by one party to the other parties of this Agreement upon personal delivery by messenger, air courier, express mail or certified registered mail, return receipt requested, or upon facsimile or telegram, or three days after mailing by first class mail by the party giving the notice, addressed to the parties as indicated below their signatures to this Agreement, or to any other address or facsimile numbers provided to the parties in writing in accordance with this Agreement by the party making the change.

20. *Attorney's Fees.*

In the event that either party must resort to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party shall be entitled to receive reimbursement from the nonprevailing party for all reasonable attorney's fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post judgment costs.

21. *Governing Law.*

This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

22. *Waivers.*

If any party shall at any time waive any rights hereunder resulting from any breach by the other party of any of the provisions of this Agreement, such waiver is not to be construed as a continuing waiver of other breaches of the same or other previsions of this Agreement. Resort to any remedies referred to herein shall not be construed as a waiver of any other rights and remedies to which such party is entitled under this Agreement or otherwise.

23. *Successors and Assigns.*

Each covenant and representation of this Agreement shall inure to the benefit of and be binding upon each of the parties, their personal representatives, assigns and other successors in interest.

24. *Entire and Sole Agreement.*

This Agreement constitutes the entire agreement between the parties and supersedes all agreements, representations, warranties, statements, promises and undertakings, whether oral or written, with respect to the subject matter of this Agreement. This Agreement may be modified only by a written agreement signed by all parties.

8/7/2001_MDC

7

25. *Severability.*

The provisions of this Agreement are meant to be enforced severally so that the determination that one or more provisions are enforceable or invalid shall not affect or render invalid any other provision of this Agreement, and such other provisions shall continue to be in full forced in accordance with their terms.

26. *Rights Cumulative.*

All rights and remedies under this Agreement are cumulative, and none is intended to be exclusive of another. No delay or omission in insisting upon the strict observance of performance of any provision of this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy. Every right and remedy may be exercised from time to time and as often as deemed expedient.

27. *Captions.*

The paragraph and other headings contained in this Agreement are for reference purposes only, and shall not limit or otherwise affect the meaning hereof.

28. *Legal Holidays.*

In the case where the date on which any action required to be taken, document required to be delivered or payment required to be made is not a business day in Denver, Colorado, such action, delivery or payment need not be made on that date, but may be made on the next succeeding business day.

29. *Counterparts.*

This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

30. *Parties.*

This Agreement shall inure solely to the benefit of and shall be binding upon the parties hereto and their respective successors, legal representatives and assigns, and no other person shall have or be construed to have any equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision contained herein.

[SIGNATURE PAGE TO FOLLOW]

3/7/2001_MDC

OCT 10 2001 14:09
Case 3:04-cv-00362-GCM   Document 14   Filed 10/08/04   Page 17 of 28

IN WITNESS THEREOF the parties to this agreement have signed and executed the Agreement, as follows:

All signatories to this Agreement do hereby declare that they have the authority to execute this Agreement on behalf of the parties to this Agreement.

SELLER:

21ˢᵗ CENTURY FINANCIAL SYSTEMS, INC.

BY _____
Michael A. Accardi, Chief Technology
Officer and Director

DATE: August _20_, 2001

BUYER:

CONSUMER CAPITAL HOLDINGS, INC.

BY _____
Michael A. Barron, President and CEO

DATE: August _20_, 2001

# AGREEMENT STOCK PURCHASE

THIS AGREEMENT is made and entered into this 12th day of November, 2002, by and between Consumer Direct of America, a Nevada Corporation (hereinafter referred to as "Seller") and *Charles L Ferguson Jr* (hereinafter referred to as "Purchaser");

## WITNESSETH:

WHEREAS, the Seller controls and is the record owner and holder of certain outstanding freely trading shares of capital stock of the issued and Direct of America, (hereinafter referred to as the "Corporation"), a Nevada corporation, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1.    PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and cause to be delivered to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer stamps affixed thereto at the expense of the Seller or at the request of the Purchaser, Seller shall provide said shares to Purchaser direct from the stock transfer agent bearing the Purchaser name on each and every stock certificate.



EXHIBIT
C

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held in Sellers place of business located in Las Vegas, Nevada. No later than _____ or such other place, date and time as the parties hereto may otherwise agree.

## 2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment shall be based on each company share valued at _.20¢_. The Purchaser shall pay to the Seller the sum of $207,000.00 dollars which shall represent 1,035,000 shares which shall be payable to Seller in full in the form of a negotiable check or equivalent method of payment to include any credit due from any and all previous transaction with Seller or a combination of both methods of payment provided it is acceptable to the Seller.

## 3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a) Organization and Standing.

Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions on Stock.

There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

## 4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

## 5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Nevada.

(d). Notices.

Any and all notices, or any other communication provided for herein, shall be given in writing by registered or certified mail addressed, to the respective addresses appearing on this document, postage prepaid, by United States Mail.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, and executed on next page by all parties,

Seller:

Consumer Direct of America
20 Corporate Park, Suite 285
Irvine, California 92606

Michael Barron, CEO

_____ Date_____

Buyer:

*Charles L Ferguson Jr*
*4800 Sentinel Post RD*
*Charlotte, N.C 28226*

_____Date_____

# GENERAL RELEASE
## AND
### SATISFACTION OF PAYMENT

BE IT KNOWN, that *Charles L. FERGUSON JR* (hereinafter referred to as "Releasor"), for and in consideration of the equivalent sum of **$207,000. °°** ($_____) Dollars, as credit towards the acquisition of stock and any other valuable consideration received from or on behalf of Consumer Direct of America (hereinafter referred to as "Releasee"), the receipt of which is hereby acknowledged, does hereby remise, release, acquit, satisfy, and forever discharge the said Releasee, of and from all manner of actions, causes of action, suits, debts, covenants, contracts, controversies, agreements, promises, claims and demands whatsoever, which said Releasor ever had, now has, or which any personal representative, successor, heir or assign of said Releasor. hereafter can, shall or may have, against said Releasee, by reason of any matter, cause or thing whatsoever, from the beginning of time to the date of this instrument. Releasor further acknowledges any all previous contracts as being paid in full.

IN WITNESS WHEREOF, the said Releasor has signed hereunto this ____ day of _____, 2002.

Signed,

*Charles L Ferguson Jr*

"RELEASOR"

*Charles L. FERGUSON JR*
*4800 SENTINEL POST RD*
*Charlotte, N.C. 28226*


EXHIBIT
D

## AGREEMENT STOCK PURCHASE

THIS AGREEMENT is made and entered into this 13th day of March 2002, by and between Consumer Direct of America, a Nevada Corporation (hereinafter referred to as "Seller") and J.H. Williamson Company, LLC (hereinafter referred to as "Purchaser");

## W I T N E S S E T H:

WHEREAS, the Seller controls and is the record owner and holder of the issued and certain outstanding freely trading shares of capital stock of Consumer Direct of America, (hereinafter referred to as the "Corporation"), a Nevada corporation, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1.    PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and cause to be delivered to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer stamps affixed thereto at the expense of the Seller or at the request of the Purchaser, Seller shall provide said shares to Purchaser direct from the stock



EXHIBIT
E

transfer agent bearing the Purchaser name on each and every stock certificate.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held in Sellers place of business located in Las Vegas, Nevada. No later than March 27, 2003 or such other place, date and time as the parties hereto may otherwise agree.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment shall be based on each company share valued at 20 cents. The Purchaser shall pay to the Seller the sum of Thirty-eight Thousand Five Hundred ($38,500.) dollars which shall represent 192,500 shares which shall be payable to Seller in full in the form of a negotiable check or equivalent method of payment to include any credit due from any and all previous transaction with Seller or a combination of both methods of payment provided it is acceptable to the Seller.

3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a)  Organization and Standing.

Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority to carry on its business as it is now being conducted.

(b)  Restrictions on Stock.

There are no restrictions on the stocks being sold. These shares are freely trading shares, which bear no legend whatsoever. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Nevada.

(d). Notices.

Any and all notices, or any other communication provided for herein, shall be given in writing by registered or certified mail addressed, to the respective addresses appearing on this document, postage prepaid, by United States Mail.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, and executed on next page by all parties,

Seller:

Consumer Direct of America
20 Corporate Park, Suite 285
Irvine, California 92606

Michael Barron, CEO

_____ Date_____


Buyer:

J.H. Williamson Company, LLC
3108 Chamber Drive, Suite B
Monroe, NC  28110

_____Date: March 13, 2003

# CERTIFICATE OF SERVICE

This is to certify that on this date I served the foregoing by first class mail addressed as follows:

      John H. Cobb, Esq.
      Brian A. Kahn, Esq.
      Helms, Mullis & Wicker
      201 North Tryon Street
      Charlotte, North Carolina

This ___ day of October, 2004

_____
Michael G. Adams